## PURCHASE AND SALE AGREEMENT – TWIN CITY TOWNHOMES

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of the ___ the day of March, 2015 by and between 5 Star Commercial, LLC, or assignees, an Indiana limited liability company or its assigns ("Purchaser"), and Dutch Village Apartments, LLC, a North Carolina limited liability company ("Seller").

1.

### SALE OF PROPERTY

1.1    Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser and Purchaser shall purchase from Seller that certain apartment complex located in the City of Winston-Salem, Forsyth County, and containing, in the aggregate, 203 units and related improvements, and commonly known as Twin City Townhomes, including all of the following described property (collectively, the "Property"):

(a)    The real property located in Forsyth County, City of Winston-Salem at 1500 Zuider Zee Drive, and being more particularly described on EXHIBIT A attached hereto and incorporated herein by this reference, together with all rights and appurtenances pertaining to such real estate, including, without limitation, any and all rights of Seller, if any, in and to adjacent roads, alleys, easements, streets and ways (collectively, the "Land");

(b)    All improvements, structures and fixtures placed, constructed or installed on the Land (collectively, the "Improvements");

(c)    All (i) mechanical systems and the fixtures and equipment related thereto comprising part of or attached to or located upon the Improvements, including, but not limited to, electrical systems, plumbing systems, heating systems, air conditioning systems, (ii) carpets, drapes, blinds and other furnishings owned by Seller and comprising a part of or attached to or located upon the Improvements, (iii) appliances owned by Seller; (iv) maintenance equipment, supplies and tools owned by Seller and used in connection with the Improvements; (v) office equipment; and (vi) other machinery, equipment, fixtures, supplies (including marketing supplies) and personal property of every kind and character owned by Seller and located in or on or used in connection with the Land or the Improvements or the operations thereon (collectively, the "Personal Property");

(d)    Landlord's interest in all leases, lease commitments and all other rental agreements (collectively, the "Leases") with tenants occupying space situated in the Improvements or otherwise having rights with regard to use of the Land or the Improvements, and all security deposits or like payments, if any, paid by tenants in connection with such Leases;

(e)    Seller's interest in all (i) brokerage or tenant locator contracts, (ii) internet, cable, or subscription television agreements, (iii) maintenance, repair, service and pest control contracts (including but not limited to janitorial, landscaping and laundry agreements), and (iv) all other contracts pursuant to which services (other than property management services) or goods are provided to the Property, to the extent the same are assignable by Seller (collectively, the "Service Contracts");

EXHIBIT 10

(f)     Seller's interest in all furniture, fixture and equipment leases, to the extent the same are assignable by Seller (the "Personalty Leases");

(g)     All intangible property owned by Seller or in which Seller has an interest, if any, in connection with any of the Land or Improvements or the operations thereon including, without limitation, Seller's interest in all warranties and guaranties relating to the Land, the Improvements or the Personal Property, to the extent same are assignable, and all site plans, surveys, plans and specifications, art work, brochures and floor plans (to the extent Seller owns and has rights to transfer such property) in Seller's possession or in the possession of Seller's leasing and management agents, of the Property and which relate to the Land, the Improvements or the Personal Property, and the right to the use thereof, including but not limited to Seller's rights under transferable business licenses, governmental permits or approvals, and the right to the use of (without warranty as to exclusivity or otherwise) any telephone numbers and listings employed in connection with the Land or the Improvements or the operations thereon (collectively, the "Intangible Property").

1.2     The Property is subject to an existing mortgage loan in the original principal amount of $7,100,000.00 (the "Loan") from Wells Fargo Bank, N.A. (together with any successors or assigns, the "Lender") to the Seller, as evidenced by the documents listed on Exhibit H attached hereto and certain other documents, instruments, certificates, and agreements executed in connection with the Loan (as amended, modified or restated, the "Loan Documents").

1.3     The sale of the Property by Seller to Purchaser is being made subject to the Loan and the Loan Documents, and the Mortgage contains a provision to the effect that the Property may be transferred in its entirety on the terms and conditions set forth therein (including, without limitation, the payment of an assumption fee equal to no more than one percent of the remaining principal balance of the Loan, together with such other fees, costs and expenses required to be paid in connection with such transfer) (the "Assumption Fees and Costs"), which Purchaser shall pay.

2.

PURCHASE PRICE

2.1     The purchase price (the "Purchase Price") for the Property shall be Seven Million and Five Hundred DOLLARS ($7,500,000.00).

2.2     Within Two (2) business days of the full execution and delivery of this Agreement by Seller and Purchaser, Purchaser shall deliver to the office of the Praet Law Firm, PLLC (the "Escrow Agent"), the sum of One Hundred Thousand AND NO/100 DOLLARS ($100,000.00) (the "Deposit"). The Deposit shall be held by Escrow Agent in an interest-bearing escrow account.  At Closing, the Deposit shall either be credited against the Purchase Price or returned by Escrow Agent to Purchaser (upon Purchaser's payment to Seller of the full Purchase Price, less any pro-rations made pursuant to this Agreement).  In either event, Purchaser shall be entitled to any interest earned on the Deposit, as long as Purchaser has not defaulted under this Agreement.

2.3     At the Closing, Purchaser shall purchase the Property under and subject to the lien of the Mortgage and subject to the other Loan Documents, and shall assume Seller's obligations under the Loan Documents.  The dollar amount of the outstanding principal balance of the Loan, together with all unpaid

EXHIBIT 10

interest which has accrued thereunder through the Closing Date shall be credited against the Purchase Price at Closing (the "Loan Assumption Credit"). The Loan Assumption Credit shall be reduced by, or Purchaser shall pay Seller at Closing, the dollar amount of any and all escrows and/or impounds held by the Lender, or its servicer, under the Mortgage (including, without limitation, the Impositions, the Replacement Reserve Account, and the Repairs Escrow Account, each as defined in the Mortgage). The approval by Lender of Purchaser's assumption of the Loan and acquisition of the Property under and subject to the lien of the Mortgage without the same constituting a default or event of default under the Loan Documents, in the manner described herein, is hereinafter referred to collectively as the "Lender Consent/Release," and shall constitute a condition precedent to Seller's and Purchaser's obligations to consummate the Closing hereunder. The Lender Consent/Release must be in writing and provide for the unconditional release of Seller, and its respective principals, officers, partners, managers, agents, employees and affiliates (collectively, the "Released Parties"), including without limitation, Dutch Village Apartments, LLC, a North Carolina limited liability company ("DVA") and Vaios T. Theodorakos, from any and all liability accruing after the Closing Date in any capacity under the Loan or the Loan Documents, in form and substance satisfactory to the Released Parties. If and to the extent that Lender requires that Purchaser assume liability for the period commencing on and continuing after the Closing Date to the same extent that DVA or any of the other Released Parties were obligated under the Loan Documents for the period prior to the Closing Date in substitution for any one or more of the Released Parties, then Purchaser shall cause such assumption and substitution to be consummated in compliance with Lender's requirements. Purchaser agrees to use its best efforts to obtain the Lender Consent/Release. Within five (5) business days after the date hereof, Purchaser shall apply to Lender for Lender to approve Purchaser's assumption of the Loan on the terms provided herein and pay any fees required at that time, and within ten (10) days thereafter Purchaser shall deliver to Lender all information required by Lender. Purchaser is aware that the Lender Consent/Release may require Purchaser to deposit about $600,000 in escrow with Lender for immediate repairs that Lender will require Purchaser to make. Seller will use its commercially reasonable efforts to assist Purchaser and the Lender with the Loan assumption.

3.

SURVEY, TITLE COMMITMENT AND INSPECTIONS

3.1    Set forth on Exhibit B attached hereto and incorporated herein is a list of exceptions which are hereby accepted and approved by Purchaser (the "Permitted Exceptions"). During the Inspection Period (as hereinafter defined), Purchaser may obtain, at Purchaser's sole cost and expense, from a title company selected by Purchaser (the "Title Company"), a current ALTA title commitment (the "Title Commitment") showing the state of title to the Property. If any exceptions appearing in the Title Commitment and not listed on EXHIBIT B attached hereto are unacceptable to Purchaser, in Purchaser's sole discretion, Purchaser shall notify Seller of such fact in writing no later than Thirty (30) days after the date of this Agreement (the "Inspection Period"). Seller shall use good faith and reasonable efforts to attempt to eliminate or modify such unacceptable exceptions; *provided, however*, that Seller shall not be obligated to bring any action or proceeding or to incur any expense whatsoever in that regard. If prior to Closing Seller (a) elects not to eliminate or (b) is unable to eliminate any such exceptions to Purchaser's satisfaction, and Seller and Purchaser have not entered into a written agreement in regard to the elimination of such exceptions, Purchaser shall be entitled to terminate this Agreement or proceed to Closing and accept title to the Property subject to such unacceptable exceptions. All exceptions appearing in the Title Commitment and not listed on EXHIBIT B attached hereto to which Purchaser does not object, or which are deemed waived and accepted by Purchaser as set forth in the immediately preceding sentence, shall be deemed included in the term "Permitted Exceptions"; *provided, however*, that as to

EXHIBIT 10

those exceptions to which Purchaser does object, if Seller modifies any such exception to Purchaser's satisfaction, then such exception, as so modified, shall be deemed included in the term "Permitted Exceptions."

3.2      Purchaser may obtain, at Purchaser's sole cost and expense, a current or updated boundary and physical survey or surveys of the Property prepared and certified to ALTA/ACSM standards by a registered land surveyor (the "Property Survey"). In the event that the Property Survey discloses any title exceptions other than Permitted Exceptions or any survey matters unacceptable to Purchaser, in Purchaser's sole discretion, Purchaser shall notify Seller of such fact in writing prior to the end of the Inspection Period. Seller shall use good faith and reasonable efforts to attempt to eliminate or cure any such exceptions or objectionable matters; provided, however, that Seller shall not be obligated to bring any action or proceeding or to incur any expenses whatsoever in that regard. If Purchaser does not object to any such exceptions or matters within the Inspection Period, then the Property Survey shall be deemed to be approved by Purchaser and any of Purchaser's rights to terminate this Agreement pursuant to this Section 3.2 shall be deemed irrevocably waived. If prior to Closing Seller (a) elects not to eliminate or cure or (b) is unable to eliminate or cure any such exceptions or matters to Purchaser's satisfaction, and Seller and Purchaser have not entered into a written agreement in regard to the elimination of such exceptions or matters, Purchaser shall be entitled to terminate this Agreement or proceed to Closing and accept title to the Property subject to such unacceptable exceptions or matters.

3.3      Within seven (7) business days from the date of this Agreement, Seller shall, at Seller's sole cost and expense, furnish Purchaser with or make available to Purchaser at the Property, the following (collectively, the "Due Diligence Documents"):

(a)      A true, correct and complete list and copies of all Service Contracts, all documents pertaining to Personalty Leases and all warranties and guaranties relating to the Property, or any part thereof;

(b)      A complete, itemized and detailed inventory of the Personal Property. Any Personal Property (including, without limitation, furniture, fixtures, equipment and appliances) leased or rented by Seller (and therefore subject to the Personalty Leases) shall be separately itemized and detailed in the inventory. All Personal Property to be excluded from the sale contemplated by this Agreement shall also be separately itemized and delivered in the inventory, and any Personal Property which is not so specified shall be conclusively be deemed to be included in the sale;

(c)      Copies of all income and expense statements for the Property, for the year-to-date and for the most recently completed prior year, and all annual financial statements for the three (3) most recent fiscal years, certified by Seller as having been prepared in accordance with Seller's prior practices and commercially reasonable accounting principles and practices, consistently applied and fairly presented;

(d)      True, correct and complete copies of ad valorem and other property tax statements (including personal property tax, if applicable) relating to the Property for the current tax year and the immediately preceding tax year, including copies of any proposed assessments for the current or forthcoming year;

(e)      Certificates of Insurance for all existing fire and extended coverage insurance pertaining to the Property, and the property insurance carrier's most recent property risk assessment;

EXHIBIT 10

(f)     A true, correct and complete (i) tenant rent roll for the Improvements, showing actual occupancies, rentals, lease terms, unit numbers, and amount of delinquent rent for each tenant, (ii) current schedule of rental rates for each type of unit within the Improvements, (iii) an accounting of all security deposits held by the Seller including an itemization of all amounts that the Seller expects to deduct from said deposits prior to tendering them to the Purchaser, and (iv) such other information regarding the tenant leases and rental units as Purchaser may reasonably request, including, without limitation a schedule of the appliances and amenities included in each type of rental unit, and the submitted tenant housing applications including tenant employer and contact information, position title, length of employment, and annual income.  Seller shall make available, for inspection by Purchaser during the Inspection Period, true, correct and complete copies of all existing tenant leases covering portions of the Property;

(g)     Copies of all site plans, surveys, soil and substrata reports and studies, engineering plans and studies, environmental reports or studies, architectural renderings, plans and specifications, as-built plans and specifications, construction contracts (with all applicable change orders), floor plans, landscape plans, utility schemes and other similar plans, diagrams or studies, if any, relating to the Property, if available; and any planning documentation, engineering plans, email and/or written correspondence between Seller and other parties;

(h)     A copy of the architect's certificate(s) rendered at or after the completion of construction of the Improvements stating that the Improvements were constructed in substantial accordance with the plans and specifications delivered to Purchaser, if available;

(i)     Copies of all reports made by engineers, architects or others, if any, relating to any structural problems or other defects with respect to any part of the Property;

(j)     Any information regarding the square footage contained in each individual apartment unit located on the Property; _provided, however_, that such information is not to be considered exact and is provided by Seller without warranty or representation;

(k)     Copies of all certificates of occupancy for the Improvements, if available;

(l)     Copies of all swimming pool permits, boiler permits and other licenses and permits for the Property required by law and issued by any governmental authority having jurisdiction over the Property, if available, as well as evidence that Seller has complied with recently enacted swimming pool regulations;

(m)     A list of all employees currently employed in the operation of the Property, setting forth his/her name, address, telephone number, position, salary, benefits, bonuses, leasing commissions, other incentives, apartment allowance and tenure with the Property; however, Purchaser may not contact or interview any employees until after the end of the Inspection Period and only upon receiving approval form Seller to do so;

(n)     A copy of the standard form of tenant lease, leasing applications, security and other deposit documents, rules and regulations, leasing brochures, occupancy checklist, current marketing/leasing plans and business plans for the Property, other standard forms and documents currently used in the leasing and marketing of the property;

EXHIBIT 10

(o)       Copies of all jurisdictional notices regarding tax increases, infrastructure improvements, zoning hearing, new construction, etc.;

(p)       An itemized list (date, item, cost) of all capital expenditures completed during the prior two (2) years;

(q)       Copies of Seller's owner's policy of title insurance insuring Seller's title to the Land, and copies of all exceptions listed in such policy, if available.

Within five (5) business days from the date of this Agreement, Seller shall make the following available for inspection by Purchaser and its duly accredited representatives:

(r)       All of Seller's books, records, leasing files, contracts, agreements and information relating to the Property for the past two (2) years and year-to-date, including (i) records of regular maintenance and repair at the Property and (ii) copies of all utility bills for the Property for the last 12 months, excluding individually metered tenant utility bills.

3.4       If within the Inspection Period Purchaser is not satisfied with the Property for any reason, Purchaser may, in its sole discretion, terminate this Agreement by written notice to Seller, and receive a full refund of the escrow deposit. If Purchaser does not elect to terminate this Agreement during the Inspection Period, it shall be deemed to have waived its right to terminate this Agreement pursuant to this Section. If Purchaser terminates this Agreement pursuant to this provision or Section 3.2 or 3.3 or fails to purchase the Property due to a default by Purchaser hereunder, Purchaser shall return to Seller the Due Diligence Documents delivered to Purchaser under Section 3.3 above and destroy all copies made.

3.5       Purchaser may, prior to the Closing Date, make such inspections, tests and investigations of the Property and such examinations of the books, records, leasing files, contracts, agreements and other instruments of Seller relating to the Property as Purchaser deems necessary or advisable and Seller shall give those persons inspecting the Property at Purchaser's request reasonable access to the Property and each of the leased premises located thereon, which access shall not unreasonably interfere with tenants in possession. Prior to conducting any invasive testing or investigation, including, without limitation, borings and physical samplings, at the Property, Purchaser shall at least one (1) business days prior to the scheduled commencement thereof provide Seller with a written request to conduct such testing or investigation, and delivering such request via e-mail shall be sufficient. Such request shall include a description of the scope of work required for such testing or investigation. Seller may approve such request in its sole discretion. If Seller approves such request, all such testing or investigation may be conducted in the presence of an officer of Seller. The cost of the inspections, tests, investigations and interviews undertaken by Purchaser shall be borne solely by Purchaser and Purchaser shall indemnify and hold Seller harmless from and against any and all loss, costs and expense, including reasonable attorneys' fees, for the costs of such inspections, tests and investigations and for damage to persons or property caused by Purchaser's inspection, testing and investigation of the Property. The indemnities contained in this Section 3.5 shall survive Closing or the earlier termination of this Agreement. The right of access to the Property granted hereby shall in no way be construed as giving Purchaser possession of or any legal or equitable title to the Property prior to Closing. If Purchaser uncovers any physical problems on the property, environmental or otherwise, Purchaser does not become obligated to remedy the problems.

4.

REPRESENTATIONS, WARRANTIES AND COVENANTS

6

EXHIBIT 10

4.1    Seller represents and warrants to Purchaser as follows (which representations and warranties shall be true and correct as of the date hereof and as of the date of Closing):

(a)    Seller owns title to the Land and Improvements in fee simple. Seller's title is encumbered by a mortgage instrument from Seller's predecessor for the benefit of Wachovia Bank recorded in Book 2749 at Page 763 in the Forsyth County Registry of Deeds (and as assigned and assumed, the "Mortgage"). Seller will convey or cause to be conveyed to Purchaser good and marketable fee simple title to the Property, subject only to the Permitted Exceptions, which includes the Mortgage;

(b)    Seller is a Limited Liability Company duly organized and legally existing under the laws of the State of North Carolina; is duly qualified to do business in the State of North Carolina; has duly and validly authorized and executed this Agreement, and has full right, title, power and authority to enter into this Agreement and to carry out all of its terms, none of which will result in any breach or constitute default under any agreement or other instrument to which Seller is a party or by which Seller or the Property might be bound;

(c)    There are no existing or pending litigation actions, suits, proceedings or claims with respect to any aspect of the Property nor, to Seller's knowledge, have any such actions, suits, proceedings or claims been threatened or asserted;

(d)    To Seller's knowledge, Seller has not received, with respect to the Property, any uncorrected notice from any insurance company, governmental agency, adjacent landowners or any other party of (i) any condition, defect, or inadequacy that, if not corrected, would result in termination of insurance coverage or increase its costs, (ii) any violation of building codes or zoning ordinances, subdivision ordinances, watershed regulations, or other governmental laws, regulations or orders, including, without limitation, any applicable laws, ordinances, statutes, codes, rules, regulations, orders and decrees relating to the handling, storage, existence of or otherwise regulating any hazardous waste, hazardous substances, toxic substances, radioactive materials, pollutants, chemicals, contaminants or industrial substances (iii) pending or threatened condemnation proceedings, (iv) any proceedings that could or would cause the change, redefinition, or other modification of the zoning classification, or of other legal requirements applicable to the Property or any part thereof, or any property adjacent to the Property, or (v) any moratorium that could or would in any way impair Seller's use of the Property for the operation of apartment complexes;

(e)    Seller has received no notice of noncompliance of the Property with any restrictive covenants and deed restrictions affecting the Property or with any zoning, subdivision, watershed, building, health, traffic, flood control, fire safety or other applicable rules, regulations, ordinances and statutes of any local, state, and federal authorities or any other governmental entities having jurisdiction over the Property;

(f)    Seller has received no notice of any unpaid charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use or operation of the Property prior to Closing which could give rise to any mechanic's or materialmen's or other statutory liens against any of the Property which will not be paid by Seller at Closing, or for which Purchaser will be responsible;

7

EXHIBIT 10

(g)    Seller is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended (hereinafter the "Code"), Sections 1445 and 7701;

(h)    Seller shall timely deliver all items required by this Agreement and each of the items submitted by or on behalf of Seller to Purchaser is to Seller's knowledge true, accurate and complete in all material respects and Seller has no knowledge of any facts that would make any such item misleading in any material respect; and

(i)    The Property does not have any violations or pending inspections/investigations by/with any governmental entity including but not limited to the City of Winston-Salem.

If, after the date of this Agreement and on or prior to Closing, Seller first obtains knowledge or first receives notice of a fact, matter or circumstance, which fact, matter or circumstance is not attributable to any action or inaction of Seller or its agents or representatives, which causes any of Seller's representations or warranties made in this Section to be inaccurate, Seller shall submit written notice thereof to Purchaser (a "Disclosure Memorandum") specifying in reasonable detail the fact, matter or circumstance causing such inaccuracy. Seller agrees to disclose any such inaccuracy in good faith and within a reasonable period of time following the discovery thereof, and Seller shall not knowingly fail to promptly disclose to Purchaser any such inaccuracy. In the event that Seller shall deliver to Purchaser a Disclosure Memorandum pursuant to this Section, then Purchaser shall have the option by written notice to Seller within seven (7) days following Purchaser's receipt of such Disclosure Memorandum (and Closing shall be deemed to be postponed to accommodate such seven (7) day period) to (i) elect to terminate this Agreement, or (ii) elect not to terminate this Agreement in which case Seller shall be relieved of any representation, warranty or indemnification obligation with respect to such fact, matter or circumstance giving rise to such inaccuracy, subject to any mutual agreement with respect to such fact, matter or circumstance. For purposes of this Section 4.1, any reference to Seller's receipt of notice shall not include any notice imputed to Seller and shall mean only actual written notice received by Seller's Representative.

Seller further covenants and agrees with Purchaser as follows:

(j)    From and after the date hereof, Seller shall not enter into any new, or modification of, Service Contracts or Personalty Leases which, as entered into or modified, would continue for a period subsequent to the Closing Date, without the prior written approval of Purchaser, such consent not to be unreasonably withheld; provided, however, that Purchaser's consent to the foregoing shall not be required if such new or modified Service Contract or Personalty Lease shall both (i) be on commercially reasonable market terms and conditions, and (ii) be cancelable on not more than thirty (30) days' prior written notice without payment of penalty or premium;

(k)    Seller will lease all vacant apartment units on the then-standard form of Agreement used by Seller, and in a manner consistent with its customary practices and with security deposits and at rental rates (and with such concessions) as Seller believes in good faith to be consistent with current market conditions. Seller will use good faith, reasonable business efforts to maintain 85% occupancy through the date of sale, but failure to maintain that occupancy rate shall not be a default by Seller;

(l)    Seller shall neither transfer nor remove any Personal Property or fixtures from the Property subsequent to the date hereof, except for any of such Personal Property that may be used or consumed by Seller in the ordinary course of operation of the Property;

EXHIBIT 10

(m)    Seller shall, from the date hereof, continue to maintain, operate and manage the Property in the same manner that it has heretofore maintained and operated the Property and all rental units (except for two (2) units noted as down units on the rent roll to be provided to Purchaser) shall be in rentable condition as of the Closing Date; *provided, however*, if any such units (other than said down units) are not in rentable condition, then Seller, at Seller's option, may either make such units into rentable condition at Seller's cost or provide to Purchaser a credit of $500.00 per each such unit that is not in rentable condition (excluding said down units), and provided further that Seller and Purchaser acknowledge that rental units which are vacated within FIVE (5) business days prior to the Closing Date will be in varying conditions of make-ready for leasing, as is ordinary in Seller's course of business and will not be subject to such credit or such requirement to be fully in rentable condition;

(n)    Seller will not cause or permit any grading, excavation or construction upon the Property or any material addition, alteration or removal of any improvements, fixtures or equipment forming a part of the Property. Seller will not use or occupy, or knowingly allow the use or occupancy of, the Property in any manner which violates any governmental requirements or which constitutes waste or a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Seller will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property to use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other governmental requirements. Seller will not impose any restrictive covenants, liens or encumbrances on the Property or execute or file any subdivision plat affecting the Property nor permit such imposition, execution or filings by any other party;

(o)    Seller hereby agrees that from the date hereof until Closing it will maintain in force, fire and extended coverage insurance upon the Property and public liability insurance with respect to damage or injury to persons or property occurring on the Property in such amounts as is maintained by Seller on the date of this Agreement;

(p)    Seller on behalf of itself, its agents, contractors and representatives agrees that so long as this Agreement has not been terminated, it will not entertain any offers to purchase the Property from any party other than Purchaser and will not market the Property to any other parties;

(q)    Seller will cause to be paid any unpaid taxes and assessments heretofore levied or assessed against the Property or any part thereof; *provided, however*, that *ad valorem* taxes for 2015 shall be prorated on a calendar year basis between Seller and Purchaser at Closing as provided in Section 7.1 hereof; and

(r)    Seller will advise Purchaser promptly if it obtains notice or knowledge of an obligation arising with respect to the Property to make any contribution or dedication of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property;

(s)    Seller will (i) promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the exhibits hereto, and (ii) do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement;

9

EXHIBIT 10

(t)    Seller's mortgage with Wells Fargo is assumable, subject to compliance with Lender's requirements.

4.2    Seller shall indemnify Purchaser, its successors and assigns, against, and shall hold Purchaser, its successors and assigns, harmless from, any and all costs, expenses, or actual damages, including reasonable attorneys' fees, which Purchaser may incur because of any breach of any of the representations, warranties or covenants herein contained, whether prior to or after Closing, subject to Section 9.1 hereof.

4.3    Purchaser represents and warrants to Seller as follows (which representations and warranties shall be true and correct as of the date hereof and as of the Closing Date):

(a)    Purchaser has duly and validly authorized and executed this Agreement, and it has full right, title, power and authority to enter into this Agreement and to carry out all of its terms; and

(b)    The execution and delivery by Purchaser and consummation of the transaction provided for herein (i) will be pursuant to proper legal authority of Purchaser's entity as to the transaction provided for herein, (ii) will not violate the organizational documents of Purchaser, (iii) do not require any approval or consent of any trustee or holders of any of its debt, and (iv) do not contravene any existing governmental requirement applicable to or binding on Purchaser or any of its property.

4.4    Purchaser shall indemnify Seller, its successors and assigns, against, and shall hold Seller, its successors and assigns, harmless from, any costs, expenses, or actual damages, including reasonable attorneys' fees, which Seller may incur because of any breach of the representations and warranties herein contained, whether prior to or after Closing, subject to Section 9.1 hereof.

5.

## CONDITIONS

5.1    The obligations of Purchaser to consummate the transaction contemplated hereby are subject to the following conditions which, if not fulfilled by Closing or as otherwise provided herein, shall entitle Purchaser, at its option, to terminate the Agreement:

(a)    The transaction contemplated under this Agreement to be effected on the Closing Date shall not be restrained or prohibited by any injunction or order or judgment rendered by any court or other governmental agency of competent jurisdiction and no proceeding shall have been instituted and be pending in which any creditor of Seller or any other person seeks to restrain such transaction or otherwise to attach any of the Property; *provided, however*, that any such proceeding or action contemplated by this Section 5.1(a) shall not be brought by, through or under Purchaser;

(b)    No change shall have occurred, without Purchaser's written consent, in the state of title matters disclosed in the Title Commitment or the Property Survey; *provided, however*, that Seller shall have the option to cure any such changes to Purchaser's satisfaction prior to the Closing Date;

(c)    Seller has timely complied with its obligations hereunder;

10

EXHIBIT 10

(d)    Purchaser obtains Lender Consent/Approval for assumption of the Loan within thirty (30) days after the Inspection Period ("Financing Period"). If Purchaser does not receive Lender Consent/Approval during or prior to the Financing Period the Purchaser may terminate this Agreement and receive a full refund of the Earnest Money less a $25.00 fee that will be surrendered to Seller; and

(e)    All warranties and representations made by Seller herein are and remain truthful in all material respects.

5.2    The obligations of Seller to consummate the transaction contemplated hereby are subject to the following conditions which, if not fulfilled by Closing or as otherwise provided herein, shall entitle Seller, at its option, to terminate the Agreement:

(a)    Purchaser has timely complied with its obligations hereunder;

(b)    All warranties and representations made by Purchaser herein are and remain truthful in all material respects;

(c)    The Lender Consent/Approval shall release Seller and its Released Parties from liability for the Loan on terms satisfactory to Seller.

6.

## CLOSING

6.1    Closing shall be held no later than Thirty (30) days following the expiration of the Inspection Period or such other later date as may be agreed upon by the parties (the "Closing Date" or "Closing"). The Purchaser shall have the option to extend the Closing Date for 30 days by making a written request prior to the current Closing Date and by increasing the Deposit by $50,000.00. Closing shall be held at the offices of the Buyer's attorney, or at such other location as may be acceptable to Seller and Purchaser, and by delivery of documents into escrow such that the parties need not be physically present for the Closing.

(a)    The Escrow Agent hereby agrees to perform the services of escrow agent for such Closing, and Seller and Purchaser agree to indemnify and hold the Escrow Agent harmless for any liability, costs and expenses, including reasonable attorneys' fees, it may incur as a result of its service as escrow agent, provided such liability does not arise from the negligence or misconduct of Escrow Agent.

(b)    At Closing, Seller shall deliver to Purchaser the items specified herein and the following documents and instruments, duly executed and acknowledged:

(i)    A Special Warranty Deed dated as of the Closing Date, conveying the Land and the Improvements to Purchaser or its permitted assignee, subject only to the Permitted Exceptions, in the form of EXHIBIT C attached hereto;

(ii)    A Bill of Sale and Blanket Assignment conveying and assigning to Purchaser or its permitted assignee the property described therein all free and clear of any

11

EXHIBIT 10

liens or encumbrances except the Permitted Exceptions, in the form of EXHIBIT D attached hereto;

(iii)    A general Tenant notice letter, dated the date of Closing, containing Seller's authorization to the tenants of the Property for payment of rental directly to Purchaser or Purchaser's managing agent in the form of EXHIBIT E attached hereto;

(iv)    An executed proration letter in the form of EXHIBIT F attached hereto;

(v)    A rent roll for the Property, certified by Seller to the best of its knowledge to be true, complete and correct in all material respects as of the Closing Date;

(vi)    Evidence acceptable to Purchaser and the Title Company, authorizing the consummation by Seller of the purchase and sale transaction contemplated hereby and the execution and delivery of the closing documents on behalf of Seller;

(vii)    An executed Certification for Form 1099-S and an executed certificate with respect to Seller's non-foreign status sufficient to comply with the requirements of Section 1445 of the Internal Revenue Code, and all regulations applicable thereto;

(viii)    All other documents or things reasonably required to be delivered to Purchaser or by the Title Company to evidence Seller's ability to transfer the Property to Purchaser;

(ix)    An executed copy of Internal Revenue Service Form 1099 as required by the Tax Reform Act of 1986, and all regulations applicable thereto;

(x)    Such affidavit as the Title Company shall require to issue its Owner's Policy of Title Insurance without exception for mechanic's or materialmen's liens or rights of parties in possession except for apartment tenants;

(xi)    A written certification by Seller that all representations and warranties of Seller set forth herein remain true and correct as of Closing, including without limitation all representations and warranties set forth in Article 4 hereof; and

(c)    On or before Closing, Purchaser, or its permitted assignee, shall do the following:

(i)    Deposit with the Escrow Agent the balance of the Purchase Price set forth in Section 2.1 hereof for disbursement upon consummation of the Closing pursuant to a closing statement to be prepared by the Escrow Agent and agreed upon by Seller and Purchaser;

(ii)    Provide evidence, acceptable to Seller and the Title Company, authorizing the consummation by Purchaser of the purchase and sale transaction contemplated hereby and the execution and delivery of the closing documents on behalf of Purchaser;

(iii)    Execute an original of the Bill of Sale and Blanket Assignment in the form of EXHIBIT D attached hereto;

EXHIBIT 10

(iv)    Execute an original of the tenant notice letter in the form of EXHIBIT E attached hereto; and

(v)    Execute an original of the proration letter in the form of EXHIBIT F attached hereto.

(d)    At Closing, Seller and Purchaser shall execute and deliver such other instruments and documents as may be necessary in order to complete Closing of the transaction contemplated hereunder and the assumption of the Loan by Purchaser, the form and content of which shall be acceptable to Seller and Purchaser.

6.2    At Closing, Seller shall provide Purchaser with the originals, to the extent available, of all documents, copies of which were provided or made available to Purchaser pursuant to Section 3.3 hereof and shall also provide Purchaser with all keys to the Property.

6.3    Purchaser shall pay (i) the cost of the Owner's Policy of Title Insurance provided for above, including, without limitation, premiums and search and exam fees, (ii) the cost of the Property Survey, (iii) all recording fees and expenses payable in connection with the sale contemplated by this Agreement, and (iv) all Assumption Fes and Costs.  All revenue stamps and transfer taxes payable in connection with the sale contemplated by this Agreement shall be paid by Seller.  All fees and expenses of the Escrow Agent in connection with its service as escrow agent hereunder shall be shared equally by Purchaser and Seller.  Each party shall pay its own attorney's fees.  All other closing costs not specifically addressed in this Agreement shall be paid by the parties in accordance with local North Carolina custom.

6.4    All (i) security and other deposits and (ii) advance or prepaid rentals paid by tenants shall be itemized by Seller, including an accounting of any deductions taken by Seller, and such amount shall be paid over to Purchaser in cash or as a credit against the amount due from Purchaser at Closing.

7.

## PRORATIONS

7.1    At Closing and at certain times subsequent to Closing, pro-rations shall be made in accordance with the proration letter attached hereto as EXHIBIT F.

8.

## POSSESSION

8.1    Purchaser shall be entitled to full and exclusive possession of the Property at Closing, subject only to the Permitted Exceptions and the rights of tenants in possession pursuant to leases delivered to Purchaser at Closing.

9.

## SURVIVAL

9.1    All warranties, representations, covenants, obligations and agreements contained in this Agreement shall survive the execution and delivery of this Agreement and shall survive Closing hereunder for a period of six (6) months.

13

EXHIBIT 10

10.

## COMMISSIONS

10.1   Seller and Purchaser each warrant and represent to each other that no realtor, broker, finder, or other intermediary has been involved with or employed by such party in connection with the transaction contemplated by this Agreement other than Multi Housing Advisors who has been employed by Seller and Seller shall be responsible for its entire commission. Seller and Purchaser agree to indemnify, hold harmless and defend the other from and against claims, loss, liability, cost and expense (including reasonable attorneys' fees at or before the trial level and any appellate proceedings) arising out of any claim made by any other realtor, broker, finder, or any other intermediary who claims to have been engaged, contracted or utilized by the indemnifying party in connection with the transaction which is the subject matter of this Agreement. This indemnification shall survive Closing or any termination of this Agreement and shall not expire as set forth in Article 9 hereof.

11.

## FURTHER INSTRUMENTS

11.1   Seller will, whenever reasonably requested by Purchaser, and Purchaser will, whenever reasonably requested by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction herein provided and to carry out the intent and purposes of this Agreement.

12.

## TERMINATION AND REMEDIES

12.1   If prior to or at Closing Seller defaults hereunder and shall have failed to have performed any of the covenants or agreements contained herein which are to be performed by Seller or if any warranty or representations made by Seller herein is not true and correct in all material respects, Purchaser may seek any remedies available at law or equity. If, after Closing Seller defaults hereunder by its failure to have performed any of the covenants or agreements contained herein which are to be performed after Closing or defaults hereunder because any warranty or representation made by Seller herein is not true and correct, Purchaser may seek to enforce its remedies under applicable law, subject to the limitations imposed by Section 9.1 of this Agreement.

12.2   If Purchaser has not terminated this Agreement pursuant to any of the provisions authorizing such termination, and prior to Closing Purchaser defaults hereunder and fails to perform any of the covenants or agreements contained herein which are to be performed by Purchaser, then Purchaser shall forfeit the Deposit together with any interest earned thereon, to Seller, as Seller's sole and exclusive remedy, as liquidated damages, due to the inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof. If Purchaser terminates this Agreement pursuant to any of the provisions authorizing such termination then Purchaser shall be entitled to a full refund of the escrow deposit. If, after Closing Purchaser defaults hereunder by its failure to have performed any of the covenants or agreements contained herein which are to be performed after Closing or defaults hereunder because any warranty or representation made by Purchaser herein is not true and correct, Seller may seek to enforce its remedies under applicable law, subject to the limitations imposed by Section 9.1 of this Agreement.

EXHIBIT 10

13.

## RISK OF LOSS

13.1    If any time prior to Closing any portion of the Property is destroyed or damaged by fire or any other casualty whatsoever, Seller shall give notice thereof to Purchaser within one (1) business day after Seller becomes aware of such casualty, but in any event prior to Closing. The rights and obligations of the parties by reason of such destruction or damage shall be as follows:

(a)    If the "cost of repair and restoration" (as such term is defined in Section 13.2) of such destruction or damage shall be $50,000.00 or less, Seller shall repair such damage as promptly as is reasonably possible, restoring the damaged Property at least to its condition immediately prior to such damage; and in such event, Purchaser may elect to defer Closing until such repair is made to Purchaser's reasonable satisfaction;

(b)    If the "cost of repair and restoration" of such destruction or damage shall exceed $50,000.00, Purchaser may elect to terminate this Agreement; and if Purchaser does not elect to terminate this Agreement, Closing shall occur as scheduled, whereupon Seller shall pay or assign to Purchaser, at Closing, all insurance proceeds payable for such damage, plus an amount equal to any deductible and the sale shall be closed without Seller's repairing such damage.    In the event Purchaser elects to terminate this Agreement, this Agreement shall be rendered null and void and the parties shall have no further obligations or liabilities hereunder, and the Deposit shall be returned to the Purchaser.

13.2    The term "cost of repair and restoration" shall mean an estimate of the actual cost of repair and restoration obtained by Purchaser (with Seller's cooperation), within TEN (10) days of receipt of notice from Seller of such destruction or damage, from a reputable contractor, reasonably acceptable to both Purchaser and Seller, regularly doing business in the city in which the Property is located.  If the Closing Date is to occur within THIRTY (30) days of the occurrence of the casualty, Closing shall be deferred by the amount of time required to obtain the cost of repair and restoration estimate.

13.3    If (i) the whole or any part of the Property or any interest in the Property is taken by condemnation or right of eminent domain prior to Closing and (ii) such taking by condemnation or right of eminent domain results in (A) the taking of all or any part of the Improvements, (B) the loss of any parking spaces which causes the Property not to comply with applicable zoning ordinances or (C) a permanent loss of any means of vehicular access to the Property, at Purchaser's option this Agreement shall terminate.  If Purchaser elects not to terminate this Agreement or does not have the right to do so under this Section 13.3, the transaction contemplated by this Agreement shall be closed in accordance with the terms of this Agreement notwithstanding any such taking but at Closing Seller shall assign to Purchaser all of Seller's rights to collect any awards which may be payable as a result of, or to recover against others for, such taking.

13.4    The provisions of this Article 13 shall control the rights and duties of the parties, in lieu of any contrary provisions of law.

14.

## TAX FREE EXCHANGE OPTION

EXHIBIT 10

14.1    Purchaser understands and acknowledges that a material inducement to Seller's entry into this Agreement is the right of Seller to structure the transaction contemplated by this Agreement so as to qualify as a tax-free exchange of like-kind property in compliance with the provisions of Section 1031 of the Code ("Section 1031"). Purchaser agrees to cooperate in all reasonable respects to allow Seller to structure the transaction contemplated by this Agreement to effect a like-kind exchange in compliance with the provisions of Section 1031 and the Regulations promulgated thereunder (the "Regulations"). Accordingly, Seller may enter into a written exchange agreement or assignment agreement at any time prior to Closing with a "Qualified Intermediary" [(as defined in Section 1.1031(k)-1(g)(4)(iii) of the Regulations] for the assignment of the rights of Seller under this Agreement to such "Qualified Intermediary" (an "Intermediary"). The Intermediary shall be designated in writing by Seller to Purchaser and Purchaser agrees that Purchaser shall sign and deliver to Seller a written instrument (to be prepared by Seller) acknowledging the designation of the Intermediary and the assignment of the right, title and interest of Seller under this Agreement to the Intermediary. Upon designation of the Intermediary by Seller and upon the Intermediary's written assumption of the obligations of Seller hereunder, the Intermediary shall be substituted for Seller as the seller under this Agreement. Purchaser agrees in such case to take title to the Property from the Intermediary and to render Purchaser's performance of all of its obligations under this Agreement to the Intermediary; provided, however, that the conveyance of title to the Property by the Intermediary to Purchaser shall be in the form of a direct deed from Seller named herein to Purchaser.

14.2    The agreement of Purchaser to cooperate in all reasonable respects with Seller's efforts to structure the transaction contemplated by this Agreement as part of a like-kind exchange under Section 1031 and the Regulations shall be subject to the following terms, provisions and conditions:

(a)    Closing shall not be delayed as a result of any like-kind exchange aspects of the transaction.

(b)    If Seller is unsuccessful in its efforts to structure the transaction contemplated by this Agreement as part of a like-kind exchange, such occurrence shall not be deemed or construed as the failure of a condition precedent to Seller's obligations under this Agreement (including Seller's obligation to consummate the transaction contemplated herein); and in such case, Closing shall proceed as if this Section were not included in this Agreement.

(c)    In no event shall Purchaser be obligated to take title to any other property of any nature or kind or to assume any other liability or exposure to facilitate Seller's like-kind exchange. Seller shall pay and reimburse Purchaser for any and all costs and expenses (if any) incurred by Purchaser as a result of the election by Seller to structure Closing as part of a like-kind exchange (but only to the extent such costs and expenses exceed the costs and expenses that otherwise would have been incurred by Purchaser hereunder). Furthermore, Seller shall indemnify and hold Purchaser harmless from and against any and all damages, demands, claims, costs and expenses (including court costs and reasonable attorneys' fees and expenses) incurred by or asserted against Purchaser as a result of the election by Seller to structure Closing as part of a like-kind exchange.

(d)    In no event shall Purchaser be required to enter into any contracts or agreements with any third parties as a part of Seller's like-kind exchange, except for a written instrument acknowledging the designation of the Intermediary (as specifically provided above). The Intermediary shall be designated in writing by Seller to Purchaser prior to Closing. Fully executed originals of all instruments between Seller and the Intermediary relating to the assignment by Seller to the Intermediary of the right, title and interest of

EXHIBIT 10

Seller under this Agreement shall be delivered to Purchaser prior to Closing. In the event Seller designates a party or entity to serve as an Intermediary, Seller shall unconditionally guarantee the full and timely performance by the Intermediary of each and every one of the representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be) of the Intermediary (as the successor Seller hereunder, by assignment) pursuant to this Agreement. As such guarantor, Seller shall be treated as a primary obligor with respect to such representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be); and, in the event of a breach by the Intermediary under this Agreement, Purchaser may proceed directly against Seller on the guarantee without the need to join the Intermediary as a party to the action. Seller unconditionally waives any defense that it might have as guarantor that it would not have if it had made or undertaken these representations, warranties, covenants, indemnities, obligations and undertakings (as the case may be) directly.

(e)     Purchaser shall not have any continuing or additional obligations after Closing arising out of or relating to Seller's decision to structure the transaction contemplated by this Agreement as a like-kind exchange.

15.

## NO ASSUMPTION

15.1    Purchaser is not and is not to be deemed to be, a successor of any Seller, it being understood that Purchaser is acquiring only the Property; and it is expressly understood and agreed that, except as may otherwise be expressly agreed to by Purchaser elsewhere in this Agreement and in the documents delivered at Closing and except with respect to the Property and the Loan, Purchaser has not and does not hereby assume or agree to assume any liability whatsoever of Seller.

16.

## NOTICES

16.1    Any notice, request, demand, instruction or other communication to be given to either party hereunder, except those required to be delivered at Closing, shall be in writing, and shall be deemed to be delivered (a) upon receipt, if delivered by facsimile or email or if hand delivered, (b) on the first business day after having been delivered to a national overnight air courier service, or (c) three (3) business days after deposit in registered or certified mail, return receipt requested, addressed as follows:

If to Seller:                     Dutch Village Apartments, LLC


                                  c/o VTT Management Inc.
                                  Attn: Michael T.Reed
                                  100 Concord Street, 3rd Floor
                                  Framingham, MA 01702
                                  E-Mail: miker@vttmanagement.com


with additional copies to:

EXHIBIT 10

Bruce A. Buckley
Womble Carlyle Sandridge & Rice, LLP
Suite 3500 One Wells Fargo Center
301 South College Street
Charlotte, NC 28202-6037
E-Mail: bbuckley@wcsr.com

If to Purchaser:                5 Star Commercial, LLC or assignees
                                304 North Main Street, Suite A
                                Middlebury, IN 46540
                                E-Mail: earl@5starinvesting.com

with additional copies to:      Praet Law Firm, PLLC
                                5920 S. Miami Blvd, Ste 201
                                Morrisville, NC 27560
                                Attention: Norman Praet
                                Telephone: (919) 627-7261
                                Facsimile: (919) 324-7235
                                E-Mail: npraet@praetlaw.com

If to Escrow Agent:             Praet Law Firm, PLLC
                                5920 S. Miami Blvd, Ste 201
                                Morrisville, NC 27560
                                E-Mail: npraet@praetlaw.com

17.

## ENTIRE AGREEMENT

17.1    This Agreement (including any exhibits and schedules attached hereto) contains the entire agreement between the undersigned parties with respect to the Property. No modification or amendment of this Agreement shall be of any force or effect unless made in writing and executed by Purchaser and Seller. Any waiver of a provision of this Agreement by a party must be in writing. Further, the prevailing party in litigation between the parties shall be entitled to recover, as a part of its judgment, reasonable attorneys' fees, costs and expenses.

18.

## MISCELLANEOUS

18.1    This Agreement may be executed in any number of counterparts which together shall constitute the agreement of the parties. The article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

18.2    This Agreement, and the rights and obligations hereunder, may be assigned by Purchaser at any time to any entity affiliated with Purchaser; *provided, however,* that any agreements, waivers or consents made or given by Purchaser under this Agreement shall be binding upon any such assignee, and such assignee shall assume Purchaser's obligations hereunder. In the event of any such assignment,

EXHIBIT 10

Seller agrees to close the transaction contemplated hereunder with the assignee of Purchaser. An assignment of this Agreement by Purchaser shall not release Purchaser from its obligations hereunder.

18.3    Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on Saturday, Sunday or legal holiday under the laws of the state in which the Property is located, then in such event said date shall be extended to the next day which is not a Saturday, Sunday or legal holiday. All references in this Agreement to "the date hereof," "the date of this Agreement," or similar references shall be deemed to refer to the later of the two (2) dates on which this Agreement has been signed by Seller and Purchaser, as indicated by their signatures below, which date shall be the date of final execution and agreement by the parties hereto.

18.4    This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, personal representative, successors and assigns whenever the context so requires or admits.

18.5    This Agreement shall be construed and enforced in accordance with the laws of the State of North Carolina, without giving effect to the conflict of laws provisions thereof.

18.6    The following exhibits have been attached to this Agreement and incorporated herein by reference:

| | | |
|---|---|---|
| EXHIBIT A | – | Description of Property |
| EXHIBIT B | – | Permitted Exceptions |
| EXHIBIT C | – | Form of Special Warranty Deed |
| EXHIBIT D | – | Bill of Sale and Blanket Assignment |
| EXHIBIT E | – | Tenant Notice Letter |
| EXHIBIT F | – | Proration Letter |
| EXHIBIT G | - | N/A |
| EXHIBIT H | -- | Wells Fargo Loan Documents |

18.7    The Purchaser may record a memorandum of this agreement.

18.8    All negotiations regarding the Property are confidential and will not be disclosed to anyone other than respective advisors, internal staff, and necessary third parties, such as lenders approached for financing.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

EXHIBIT 10

IN WITNESS WHEREOF, the undersigned parties have caused this Purchase and Sale Agreement to be executed as of the date first written above.

SELLER:

DUTCH VILLAGE APARTMENTS, LLC
a North Carolina limited liability company

By: VTT Management Inc., a North Carolina
corporation
Its  Manager

By: _____

    Name: _____ Michael T - Reed
    Title: _____ Coo / VP
    Date: _____ 3/5/15

PURCHASER:

5 STAR COMMERCIAL, LLC
an Indiana limited liability company

By: _____ Earl Miller _____

    Name:  Earl Miller
    Title: Manager
    Date:_____ 03/07/15

[SIGNATURES CONTINUED ON NEXT PAGE]

EXHIBIT 10

The undersigned hereby accepts this Purchase and Sale Agreement and agrees to perform the functions of Escrow Agent hereunder.

ESCROW AGENT:
Praet Law Firm, PLLC


By: _____
Name:  Norman Praet
Title:  Manager

EXHIBIT 10

<u>EXHIBIT A</u>

DESCRIPTION OF PROPERTY

<u>FORSYTH COUNTY PARCEL ID # 6824-80-5424.00</u>

EXHIBIT 10

EXHIBIT B


PERMITTED EXCEPTIONS

1. Deed of Trust, Security Agreement and Fixture Filing executed by Dutch Village Triad Apt. Portfolio, LLC, to Timothy W. Gilbert, Trustee for Wachovia Bank, National Association, dated April 30, 2007 in the amount of $7,100,000.00 and recorded on April 30, 2007, in Book 2749, Page 763, Forsyth County Registry and assigned to Wells Fargo Bank, N.A., as Trustee for Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32 as evidenced by Assignment dated August 9, 2007 and recorded on November 16, 2007 in Book 2796, Page 771, as assumed by Dutch Village Apartments, LLC in that certain Loan Assumption and Substitution Agreement dated November 16, 2007 and recorded on November 16, 2007 in Book 2796, Page 785, Forsyth County Registry.

2. Assignment of Leases and Rents to Wachovia Bank, National Association recorded in Book 2749, Page 840 and assigned in Book 2796, Page 778, Forsyth County Registry.

3. UCC Fixture Filing recorded in Book 2811, Page 52, Forsyth County Registry.

4. UCC Financing Statement File Number 20080012446J, North Carolina Secretary of State.

5. Taxes for the year 2015 not yet due and payable, and subsequent years.

6. Building restriction lines, easements, and any other matters shown on map or plat recorded in Plat Book 24, Page 83, Forsyth County Registry, said matters being located substantially as shown on survey by Borum, Wade and Associates, P.A., dated June 12, 2006.

7. Easement(s) and/or right(s) of way in favor of Southern Public Utilities recorded in Book 419, Page 155, Forsyth County Registry.

8. Easement(s) and/or right(s) of way in favor of Duke Power Company recorded in Book 437, Page 256; Book 437, Page 271; Book 437, Page 278; Book 478, Page 190; Book 578, Page 360; Book 584, Page 389; Book 754, Page 147; Book 993, Page 297; and Book 993, Page 301, Forsyth County Registry.

9. Cable Lease with Summit Cable Services of Forsyth County, Inc., dba Time Warner Cable recorded in Book 2093, Page 87, Forsyth County Registry.

10. Easement Agreement between Southeast Mortgage & Investment Corp. and Partners in Communications, Inc. recorded in Book 1827, Page 1926, Forsyth County Registry.

EXHIBIT 10

11. Rights of tenants under unrecorded leases or rental agreements, as tenants only, without the right of first refusal/offer or the option to purchase.

12. License to Time Warner Cable recorded in Book 2782, Page 2685, Forsyth County Registry.

13. The following matter(s) as shown on survey by Borum, Wade and Associates, PA, dated June 12, 2006, and any easements, rights-of-way, or other interests associated therewith:

   a. Various utility lines with curb inlets, light poles, power poles, yard inlets, cleanouts, sanitary lines and manholes, storm lines and manholes, overhead power lines, curbs and gutters, hydrants, water meters, sewer cleanouts, water valves, drainage inlets, gas meters, power meters and power box located on the land.

14. Any encroachments, overlaps, boundary line disputes, easements, measurements, variations in area or content, party walls or other facts which a correct survey and inspection of the premises would show subsequent to June 12, 2006.

15. Easement and memorandum of agreement to Time Warner Cable Inc. recorded in Book 3117, Page 2620, Forsyth County Registry.

EXHIBIT 10

EXHIBIT C

FORM OF SPECIAL WARRANTY DEED

[USE NORTH CAROLINA BAR FORM]

EXHIBIT 10

## EXHIBIT D

### BILL OF SALE AND BLANKET ASSIGNMENT

STATE OF NORTH CAROLINA    )

                                 )    **KNOW ALL BY THESE PRESENTS:**

COUNTY OF  _____        )

THAT Dutch Village Apartments, LLC ("Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration to Grantor in hand paid by 5 Star Commercial, LLC ("Grantee"), has Granted, Sold, Assigned, Transferred, Conveyed, and Delivered and does by these presents Grant, Sell, Assign, Transfer, Convey, and Deliver unto the said Grantee, all the following described properties, rights, and interests arising or used in connection with that certain real property and the improvements thereon, as more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Real Property"):

(a)      All (i) mechanical systems and the fixtures and equipment related thereto comprising a part of or attached to or located upon the Real Property, including, but not limited to, electrical systems, plumbing systems, heating systems, air conditioning systems; (ii) carpets, drapes, blinds and other furnishings owned by Grantor and comprising a part of or attached to or located upon the Real Property; (iii) appliances owned by Grantor; (iv) maintenance equipment, supplies and tools owned by Grantor and used in connection with the Real Property; (v) other machinery, equipment, fixtures, supplies (including marketing supplies) and personal property of every kind and character owned by Grantor and located in or on or used in connection with the Real Property or the operations thereon and all of the personal property listed on Exhibit B attached hereto and incorporated herein by reference (the "Personal Property") (herein, the Real Property and the Personal Property are sometimes collectively referred to as the "Property");

(b)      Grantor's interest in leases, lease commitments and all other rental agreements with tenants occupying space situated in the improvements at the Real Property or otherwise having rights with regard to use of the Property, including, without limitation, all of the tenant leases described on Exhibit C attached hereto and incorporated herein by reference (collectively, the "Leases"), and all security deposits or like payments, if any, paid by tenants in connection with such Leases.

(c)      Grantor's interest in all (i) brokerage or tenant locator contracts; (ii) cable or subscription television agreements; (iii) maintenance, repair, service and pest control contracts (including but not limited to janitorial and landscaping agreements); and (iv) all other contracts pursuant to which services (other than property management services) or goods are provided to the Property, to the extent the same are assignable by Grantor, including, without limitation, the contracts described on Exhibit D attached hereto and incorporated herein by reference (collectively, the "Service Contracts");

(d)      Grantor's interest in all furniture, fixture and equipment leases, to the extent the same are assignable by Grantor, including but not limited to those listed on Exhibit E attached hereto and incorporated herein by reference (collectively, the "Personalty Leases");

(e)      All intangible property owned by Grantor or in which Grantor has an interest, if any, in connection with any of the Property or the operations thereon including, without limitation, Grantor's interest in all warranties and guaranties relating to the Property, to the extent same are assignable, and all site plans, surveys, plans and specifications, floor plans, art work and

EXHIBIT 10

brochures (to the extent Grantor owns and has rights to transfer such property) in Grantor's possession or in the possession of Grantor's leasing and management agents, of the Property and which relate to the Property, and the right to the use thereof, including but not limited to Grantor's rights under transferable business licenses, governmental permits or approvals, and the right to the use of (without warranty as to exclusivity or otherwise) any telephone numbers and listings employed in connection with the Property or the operations thereon (collectively, the "Intangible Property");

TO HAVE AND TO HOLD the assets hereby sold, transferred and assigned unto Grantee, its successors and assigns forever and Grantor binds itself and its successors and assigns to forever WARRANT AND DEFEND the assets hereby sold unto Grantee, its successors and assigns, forever against every person whomsoever lawfully claiming or to claim such herein described assets or any part thereof by, through or under Grantor, but not otherwise.

It is understood and agreed that, by its execution hereof, Grantee hereby accepts the Personal Property in its AS IS, WHERE IS condition.

It is understood and agreed that, by its execution hereof, Grantee hereby assumes and agrees to perform all of the terms, covenants and conditions of the Leases, on the part of the lessor therein required to be performed from and after the date hereof including, but not limited to, the obligation to repay, in accordance with the terms of such Leases, to such lessees, all security deposits or like payments (to the extent such security deposits or like payments are delivered to Grantee by Grantor pursuant to this Bill of Sale and Blanket Assignment) required to be repaid by the terms thereof and to indemnify, save and hold harmless Grantor from any and all liability, claims or causes of action, loss, cost, or expense (including reasonable attorneys' fees) arising out of or relating to Grantee's failure to perform any of the obligations of Grantor arising under the Leases after the date hereof, or the claims of any tenants to security deposits, prepaid rents, future rent concessions or rebates which are transferred to Grantee by Grantor pursuant to this Bill of Sale and Blanket Assignment.

It is understood and agreed that, by its execution hereof, Grantee hereby assumes and agrees to perform all of the terms, covenants and conditions contained in all Service Contracts and such other documents and instruments assigned hereunder from and after the date hereof, to discharge any and all such obligations of Grantor under said Service Contracts, documents and instruments promptly and to indemnify, save and hold harmless Grantor from any and all liability, claims, causes of action, or expense (including reasonable attorneys' fees) existing in favor of or asserted or claimed by other parties to said documents or instruments, arising out of or relating to Grantee's failure to perform any of the obligations of Grantor under the Service Contracts and such other documents and instruments herein assigned after the date hereof.

It is understood and agreed that, by its execution hereof, Grantor hereby agrees to indemnify, save and hold harmless Grantee from any and all liability, claims or causes of action, loss, cost or expense (including reasonable attorneys' fees) arising out of or relating to Grantor's failure to perform any of the obligations of Grantor under the Leases prior to the date hereof. Grantor hereby further agrees to indemnify, save and hold harmless Grantee from any and all liability, claims, causes of action, or expense (including reasonable attorneys' fees) existing in favor of or asserted or claimed by other parties to any Service Contracts, or other documents or instruments assigned hereunder, arising out of or relating to Grantor's failure to perform any of the obligations of Grantor under the Service Contracts and such other documents and instruments herein assigned prior to the date hereof.

IN WITNESS WHEREOF, Grantor has caused this Bill of Sale and Blanket Assignment to be executed effective as of the ___ day of _____,2015.

EXHIBIT 10

GRANTOR:


DUTCH VILLAGE APARTMENTS, LLC
a North Carolina limited liability company

By: VTT Management Inc., a North Carolina
corporation
Its  Manager


By:_____
      Name:_____
      Title:_____
      Date:_____

GRANTEE:

5 STAR COMMERCIAL, LLC

By:_____
    Name: Earl Miller
    Title: Manager

EXHIBIT 10

Exhibit A to Bill of Sale and Blanket Assignment

LEGAL DESCRIPTION

EXHIBIT 10

Exhibit B to Bill of Sale and Blanket Assignment

PERSONAL PROPERTY INVENTORY

EXHIBIT 10

Exhibit C to Bill of Sale and Blanket Assignment

SCHEDULE OF TENANT LEASES (I.E., RENT ROLL)

EXHIBIT 10

Exhibit D to Bill of Sale and Blanket Assignment

SERVICE CONTRACTS

EXHIBIT 10

Exhibit E to Bill of Sale and Blanket Assignment

FURNITURE, FIXTURE AND EQUIPMENT LEASES

EXHIBIT 10

Exhibit F to Bill of Sale and Blanket Assignment

TENANT'S SECURITY DEPOSITS

EXHIBIT 10

EXHIBIT E

TENANT NOTICE LETTER

_____ _____, 2015

To:     The Tenants of Twin City Townhomes (the "Property")

Dear Tenant:

This letter is to inform you that on _____ _____, 2015, Dutch Village Apartments, LLC ("Landlord"), transferred its ownership interest in the above-referenced Property to 5 Star Commercial, LLC ("Purchaser"). All rights of the Landlord under your lease have been assigned to Purchaser, and Purchaser has received and is responsible for your security deposit.

The Property will be managed by _____. You should make your rent checks payable to _____. The [new] address for your payment of rent under your Lease [is/remains] _____ [,effective immediately].

Sincerely yours,

DUTCH VILLAGE APARTMENTS, LLC
a North Carolina limited liability company

By: VTT Management Inc., a North Carolina corporation
Its  Manager


By:_____
    Name:_____
    Title:_____
    Date:_____


Accepted and Agreed To:

5 Star Commercial, LLC
an Indiana limited liability company

By: _Earl Miller_____
    Name:  Earl Miller
    Title: Manager
    Date:_____ 03/07/15 _____

EXHIBIT 10

EXHIBIT F

PRORATION LETTER

_____ ____, 2015

_____
_____
_____

Ladies and Gentlemen:

Reference is made to that certain Purchase and Sale Agreement dated effective as of _____, 2015 (the "Agreement"), by and between DUTCH VILLAGE APARTMENTS, LLC, a[n] North Carolina limited liability company ("Seller"), and 5 STAR COMMERCIAL, LLC , an Indiana limited liability company("Purchaser"), with respect to the property commonly known as Twin City Townhomes (the "Property"). Defined terms used herein and not otherwise defined herein shall have the same meaning attributed to them in the Agreement. In consideration of the purchase of the Property by Purchaser from Seller of even date herewith (the "Closing"), it is mutually agreed and understood by Seller and Purchaser as follows:

1.    Rents and all other income collected with respect to the Property have been prorated effective as of _____ (the "Closing Date") and Seller has credited Purchaser $_____ against the purchase price to be paid by Purchaser at Closing or has paid such amount directly to Purchaser. Included in such sum is the amount of any rents collected for the month of _____ from tenants of the Property for the period of time occurring on and subsequent to the Closing Date. Any rents subsequently collected by Purchaser (a) for the month in which the Closing Date occurs shall be similarly prorated and Purchaser shall promptly remit to Seller Seller's share, and (b) from tenants of the Property who owe rent for periods prior to the Closing Date shall be applied by the Purchaser first to any rent due for the then current month and then any excess shall be applied (and prorated) first to the month in which the Closing Date occurred and then applied to rent due for any month prior to the month of the Closing Date (which Seller shall be entitled to) and Purchaser shall promptly remit to Seller the amounts to which Seller is entitled, for a period of 60 days following the Closing only.

2.    *Ad valorem* taxes, charges and assessments and personal property taxes relating to the Property for the current year were prorated between Seller and Purchaser as of the Closing Date, based upon the best available estimates of the amount of taxes, charges and assessments that will be due and payable on the Property during the current year. Seller has credited Purchaser $_____ against the purchase price paid by Purchaser at Closing, such sum representing Seller's estimated pro rata portion of such taxes, charges and assessments or has paid such amount directly to Purchaser. At such time as the actual amount of taxes, charges and assessments against the Property for the current year is known, Seller and Purchaser shall readjust the amount of taxes to be paid by each party (but only if the total of such taxes differs by more than $1,000) so that Seller shall pay only those actual taxes, charges and assessments attributable to the period of time occurring prior to the Closing Date and Purchaser shall pay only those actual taxes, charges and assessments attributable to the period of time occurring on and subsequent to the Closing Date; provided, however, that any such readjustment shall occur only in the event that the amount of *ad valorem* tax liability increases due to a change in the millage rate and in no event due to a change in assessed valuation of the Property subject to taxation resulting from the sale of the Property to Purchaser. Purchaser has assumed and agrees to pay *ad valorem* taxes,

EXHIBIT 10

charges and assessments and personal property taxes relating to the Property for the current year. In the event the *ad valorem* taxes, charges or assessments or personal property taxes are contested and a reduction in such taxes is obtained relating to periods prior to the Closing Date, Seller and Purchaser shall readjust the amount of taxes to be paid by each party so that Seller shall be provided the net benefit of such reduced taxes. The "net benefit" of such reduced taxes shall equal the amount of the reduction in such taxes less the actual out-of-pocket expenses incurred by Purchaser and payable to third parties in connection with the contest of and obtaining the reduction of such taxes.

3.      Expenses (and any income) for the existing Service Contracts and the Personalty Leases which Purchaser has assumed in connection with its purchase of the Property and for any agreements relating to cable TV or laundry services have been prorated as of the Closing Date such that Seller shall be responsible for all expenses and entitled to all income in connection with such Service Contracts and Personalty Leases and other agreements attributable to the period of time occurring prior to the Closing Date and Buyer shall be responsible for such expenses and entitled to such income attributable to the period of time occurring on and subsequent to the Closing Date; however any up front prepaid, lump sum amounts already paid to Seller relating to cable TV or laundry services shall not be prorated. To give effect to such proration, either a payment has been made directly to the party with the positive balance in the calculation thereof or Seller and Purchaser have adjusted the purchase price paid by Purchaser at Closing. All other ordinary operating expenses incurred by Seller prior to the Closing Date shall be the Seller's sole responsibility. Seller has caused all utility meters to be read as of the Closing Date and Seller shall be responsible for all utility charges up to the Closing Date. Any utility charges attributable to the period of time occurring on and subsequent to the Closing Date shall be the Purchaser's responsibility and the obligation to pay and any utility adjustments or refunds made after the Closing Date shall be property of Purchaser. Purchaser shall post, in its own behalf, all utility deposits and Seller will be responsible for obtaining a refund of its utility deposits.

4.      In the event any adjustments are required pursuant to this letter agreement, then either party hereto who is entitled to additional money shall invoice the other party for such additional amounts as may be owing, and such amounts shall be paid within SEVEN (7) days from receipt of the invoice. Such invoice shall include reasonable documentation to support the amounts claimed to be owing.

5.      Sixty (60) days after the Closing Date Seller and Purchaser shall "true up" charges for water/sewer utility bills due to such charges being billed to tenants in arrears, and Seller and Purchaser agree to pay, as applicable, to the other such amounts as are appropriate to provide for Seller to recapture from such tenant payments amounts for water/sewer that were paid by or allocated to Seller as of the Closing.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

EXHIBIT 10

If the foregoing accurately sets forth the agreement of Seller with Purchaser, please execute this letter in the space provided below, whereupon this letter shall constitute a valid and binding agreement between Seller and Purchaser.

Very truly yours,

Dutch Village Apartments, LLC
    By: VTT Management Inc.
        Its Manager

By:_____
        Name: _____
        Title: _____


Agreed and Accepted:

5 Star Commercial, LLC
an Indiana limited liability company

By:_____
        Name:  Earl Miller
        Title: Manager
        Date:_____03/07/15_____

EXHIBIT 10

EXHIBIT G
[NOT APPLICABLE]

EXHIBIT 10

EXHIBIT H

LOAN DOCUMENTS

1. Deed of Trust, Security Agreement and Fixture Filing executed by Dutch Village Triad Apt. Portfolio, LLC, to Timothy W. Gilbert, Trustee for Wachovia Bank, National Association, dated April 30, 2007 in the amount of $7,100,000.00 and recorded on April 30, 2007, in Book 2749, Page 763, Forsyth County Registry and assigned to Wells Fargo Bank, N.A., as Trustee for Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2007-C32 as evidenced by Assignment dated August 9, 2007 and recorded on November 16, 2007 in Book 2796, Page 771, as assumed by Dutch Village Apartments, LLC in that certain Loan Assumption and Substitution Agreement dated November 16, 2007 and recorded on November 16, 2007 in Book 2796, Page 785, Forsyth County Registry.

2. Assignment of Leases and Rents to Wachovia Bank, National Association recorded in Book 2749, Page 840 and assigned in Book 2796, Page 778, Forsyth County Registry.

3. UCC Fixture Filing recorded in Book 2811, Page 52, Forsyth County Registry.

4. UCC Financing Statement File Number 20080012446J, North Carolina Secretary of State.

5. Promissory Note dated April 30, 2007 in the original principal amount of $7,100,000, as modified by Allonge to Note dated November 16, 2007.

6. Indemnity and Guaranty Agreement dated April 30, 2007.

7. Environmental Indemnity Agreement dated April 30, 2007.

EXHIBIT 10